UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

GREG HUDIK,                         )
                                    )
        Plaintiff,                  )
                                    )
v.                                  )       NO. 3:19-cv-00127
                                    )
FOX NEWS NETWORK, LLC               )       JUDGE RICHARDSON
and SASHA SAVITSKY,                 )
                                    )
        Defendants.                 )


## MEMORANDUM OPINION

Pending before the Court is Defendants' Motion to Dismiss (Doc. No. 47). Plaintiff filed a

response (Doc. No. 53, "Response"), and Defendants replied (Doc. No. 55). For the following

reasons, Defendants' Motion to Dismiss will be granted.

## BACKGROUND[1]

Plaintiff Greg Hudik is a singer, songwriter, musician, and owner of Platinum Records

Nashville LLC ("PRN"). (Doc. No. 42 at ¶ 1). As a musician, Plaintiff performed at the first MTV

Spring Break concert in 1986 which had 400,000 people in attendance and a further 80 million

viewers watching on television. (*Id.* at ¶ 7). Since 2016, Plaintiff has released seven singles

nationally to radio, including his song "Music's a Religion" which went to the #2 position on the

country-gospel charts in 2018. (*Id.* at ¶ 8).

Daryle Singletary was a country-music artist known for his singles "I Let Her Lie" and

"Amen Kind of Love," both of which peaked at the #2 position on the Billboard country charts in

---

[1] The following facts are alleged in the First Amended Complaint and accepted as true for purposes of the Motion to Dismiss.

the mid-1990s. (*Id.* at ¶ 11). In an effort to get Mr. Singletary back on the Billboard charts, Plaintiff and Mr. Singletary contracted to record and release the song "We're Not Going to Hell (For Having a Hell of a Time)" in 2016. (*Id.* at ¶ 12). Some time later, Plaintiff hired Mr. Singletary to sing a song entitled "She's Been Cheatin' On Us" ("The Song"), which Plaintiff was mixing and mastering. (*Id.* at ¶ 14). Mr. Singletary discussed his financial struggles with the Plaintiff during these sessions. (*Id.* at ¶ 13). Plaintiff owned all rights to The Song. (*Id.* at ¶ 20).

Mr. Singletary suddenly and unexpectedly passed away on February 12, 2018 at the age of 46. (*Id.* at ¶ 16). The next day, Plaintiff sent an email blast to PlayMPE.com, an online music promotion and delivery service that supplies songs to radio stations; the blast stated that PRN wanted to release a new, unheard song (The Song) sung by Mr. Singletary with a fund to be created that would benefit the Singletary family from the proceeds of 100 percent of all digital downloads of The Song. (*Id.* at ¶ 21). Plaintiff then listed The Song on iTunes so that it could be downloaded. (*Id.*). The photographs used to promote The Song were licensed to Plaintiff to promote "We're Not Going To Hell (For Having A Hell Of A Time)" rather than The Song. (*Id.* at ¶ 24).

Later that day, Wayne Halper, attorney for Holly Singletary (wife of Mr. Singletary) and Chuck Rhodes (Mr. Singletary's business partner), instructed Plaintiff to take down all images used to promote The Song as well as the recording. (*Id.*, Doc. No. 48-2). He further instructed Plaintiff not to set up an unauthorized fund for the Singletarys. (Doc. No. 48-2). Plaintiff immediately agreed to do so. (Doc. No. 42 at ¶ 25). Plaintiff then spoke with Donna Lee, whom he believed was Mr. Singletary's Manager and Booking Agent. (*Id.* at ¶ 26). Ms. Lee gave Plaintiff permission to use Mr. Singletary's images from "We're Not Going To Hell (For Having A Hell Of A Time)" and promised that she would speak to Holly Singletary about whether Holly wanted the charity. (*Id.* at ¶ 26).

On February 14, 2018, Plaintiff sent another email blast to PlayMPE.com under the title, "100% of ALL downloads go to the Holly Singletary Fund Raiser." (*Id.* at ¶ 27). In this blast, he instructed radio stations to not download or play The Song until the fund was set up. (*Id.*).

That same day, Rhodes posted his dissatisfaction with the situation to his personal Facebook page. The post reads in full:

> Just wanted to throw a little clarity on a situation that has been troubling me since Monday concerning the release of new music by my business partner and friend of 21 yrs, Daryle Singletary. "It has come to our attention that Greg Hudik at Platinum Records Nashville has been releasing music sung by Daryle Singletary. I want to make it crystal clear that this music being released has not been approved or sanctioned by Holly Singletary, The Singletary Family, Daryle's corporation TMF x 4, Donna Lee and Buddy Lee Attractions, Daryle's booking agency or his attorney Wayne Halper. The recordings were "works for hire" where Daryle was paid as a demo singer. I have worked with Daryle for 21 years to uphold the musical integrity of his recordings, his song choices and his record production along with Daryle's co-producer Greg Cole. These songs were never meant to be released as master recordings and do not reflect the Gold standard that Daryle held himself to and anybody in our immediate team that worked with him. There was also a mention by Mr. Hudik of a "fund" established with proceeds from downloads going to Holly Singletary and Daryle's family. At this time, no such fund exists, and when established, will be sanctioned by the Singletary family and overseen by Donna Lee at Buddy Lee Attractions. A cease and desist letter has been sent to Mr. Hudik demanding the songs be taken down immediately.

(*Id.* at ¶ 28, Doc. 42-1). On February 16, 2018, Defendant Sasha Savitsky, an entertainment editor at co-Defendant Fox News Network, reached out to Plaintiff for a comment "regarding Chuck Rhodes' cease and desist." (Doc. No. 42 at ¶ 31). Plaintiff spoke with Defendant Savitsky over the phone that morning and explained his side of the story. (*Id.* at ¶¶ 32-34). Defendants never spoke with Rhodes but rather only read his Facebook post. (*Id*. at ¶ 39).

That same day, Defendants posted to FoxNews.com an article entitled, "Daryle Singletary's new single is a scam, not benefiting his widow and kids, business partner says" ("The Article") which is the subject of this lawsuit. (*Id.* at ¶ 35). The Article reads in full (omitting graphics and corresponding captions):

3

Daryle Singletary's record label announced shortly after his death that the company would be releasing an unpublished song from the late singer to benefit his widow and four children — but Singletary's business partner is fighting back.

Singletary died suddenly at age 46 on Monday. The cause of death is still unknown but a source told Fox News the family suspects he died of a blood clot.

On Wednesday, Platinum Records Nashville released "She's Been Cheatin' on Us," saying the company was setting up a fund for the Singletary family and would donate 100 percent of the proceeds to the fund.

However, Singletary's business partner Chuck Rhodes told Fox News that not only does no such fund exist, but the single released by Platinum Records Nashville is not a song of the late country singer.

"I want to make it crystal clear that this music being released has not been approved or sanctioned by Holly Singletary, The Singletary Family," Rhodes told Fox News in a statement.

Rhodes said the recording was simply "work for hire where Daryle was paid as a demo singer."

Rhodes, who has worked with Singletary for 21 years, told Fox News the song was "never meant to be released" and does not reflect "the Gold standard that Daryle held himself to."

However, Platinum Records Nashville President Greg Hudik told Fox News the song was part of the final album he recorded with Singletary and was not a demo.

"It's the last thing that Daryle ever recorded, and I wanted the world to hear it. I wanted the family to get the benefit," Hudik told Fox News.

Hudik said his own father died when he was in fifth grade, leaving his mom to "feed six kids." When he heard of Singletary's passing he wanted to help his widow and children anyway he could.

"I wanted to do something for Daryle's family because the last time me and Daryle were in the studio, he told me about his financial struggles and how he was playing weekend to weekend to feed his family," Hudik said.

However, Rhodes said the Singletary family has not been made aware of any fund for the family. He has sent a cease and desist letter to Platinum Records Nashville to remove the song immediately.

Hudik said he is waiting until after Singletary's funeral to set up the fund but told Fox News he will remove the song if "that's what Holly [Singletary] wants."

Singletary was best known for his hit songs "Too Much Fun," "I Let Her Lie" and "Amen Kind of Love."

Plaintiff thereafter reached out multiple times to Defendant Savitsky in an attempt to have her either change The Article's wording or to further cover his side of the story. (*Id.* at ¶¶ 46-50). On February 16, 2018, Defendant Savitsky replied that Fox News had included Plaintiff's side of the story with quotes and, three days later, notified Plaintiff of a change in headline and that Defendants were not planning future coverage of the story. (*Id.* at ¶¶ 48, 52). Even with the change

4

in headline, which simply removed the phrase "is a scam," the URL link to the news story kept the original headline with the word "scam" still in place. (*Id.* at ¶ 53).[2]

On February 8, 2018, Plaintiff filed his Complaint in this Court, invoking this Court's diversity jurisdiction and asserting three claims against both Defendants[3]: a defamation claim, a claim of false light invasion of privacy, and a claim of defamation by implication or innuendo. (Doc. No. 1). On October 15, 2019, Plaintiff filed a First Amended Complaint, which asserted the same three claims. (Doc. No. 42).

## LEGAL STANDARD

For purposes of a motion to dismiss brought pursuant to Rule 12(b)(6), the Court must view all the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss brought pursuant to Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id*. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id*. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id*. at 679. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id*. at

---

[2] The URL read https://www.google.com/amp/www.foxnews.com/entertainment/2018/02/16/darylesingletarys-news-single-is-scam-not-benefiting-his-widow-and-kids-business-partnersays.amp.html

Notably, this link no longer functions, as the article has been taken offline.

[3] Twenty-First Century Fox, Inc. was originally named as a Defendant but was later voluntarily dismissed by Plaintiff on April 29, 2019. (Doc. No. 26).

678; *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010); *Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely *consistent* with the defendant's liability do not satisfy the claimant's burden, as mere consistency does not establish *plausibility* of entitlement to relief even if it supports the *possibility* of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), it may be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. Identifying and setting aside such allegations is crucial, because they simply do not count toward the plaintiff's goal of showing plausibility of entitlement to relief. As suggested above, such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or "bald" allegations. *Id*. at 681. The question is whether the remaining allegations—factual allegations, *i.e.*, allegations of factual matter – plausibly suggest an entitlement to relief. *Id*. If not, the pleading fails to meet the standard of Fed. R. Civ. P. 8 and thus must be dismissed pursuant to Rule 12(b)(6). *Id*. at 683.

As a general rule, matters outside the pleadings may not be considered in ruling on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) unless the motion is converted to one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). However, when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment. *Doe v. Ohio State Univ*., 219 F. Supp. 3d 645, 652-53 (S.D. Ohio 2016); *Blanch v. Trans Union, LLC*, 333 F. Supp. 3d 789, 791-92 (M.D. Tenn. 2018).

6

## ANALYSIS

This Court has jurisdiction over this defamation dispute based on diversity jurisdiction. Under the so-called *Erie* doctrine, a federal court sitting in diversity applies the substantive law of the state in which it sits. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) (holding that a federal court sitting in diversity is bound to follow the law of the forum state); *Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 566 (6th Cir. 2001) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Tennessee substantive law therefore governs. Part of Tennessee's substantive law for this Court to apply is Tennessee's choice-of-law rules, which theoretically could direct the Court to apply the underlying law (*i.e.*, the law excluding choice-of-law rules) of some other state. *See Standard Fire Ins. Co. v. Ford Motor Co.*, 723 F.3d 690, 692–93 (6th Cir. 2013). But here, the Court has not been presented with any argument or reason to believe that under Tennessee's choice-of-law rules, it should apply the underlying law of some state other than Tennessee. Accordingly, Tennessee underlying substantive law would appear to apply, and the parties seem to agree on that point.

### I.     Defamation

Under Tennessee law, to establish a prima facie case of defamation, a plaintiff must prove that: "(1) a party published a statement; (2) with knowledge that the statement was false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement." *Bohler v. City of Fairview, Tennessee*, 429 F. Supp. 3d 477, 490 (M.D. Tenn. 2019), aff'd sub nom. *Bohler v. City of Fairview*, No. 20-5016, 2020 WL 5758016 (6th Cir. Sept. 28, 2020) (citing *Brown v. Christian Bros. Univ.*, 428 S.W.3d 38, 50 (Tenn. Ct. App. 2013)).

Courts must determine as a question of law whether statements are capable of having a defamatory meaning. *Aegis Scis. Corp. v. Zelenik*, No. M2012-00898-COA-R3CV, 2013 WL 175807, at *7 (Tenn. Ct. App. Jan. 16, 2013); *Memphis Publishing Co. v. Nichols*, 569 S.W.2d 412, 419 (Tenn. 1978). The Tennessee Court of Appeal recently summarized Tennessee law regarding what constitutes defamatory meaning:

> "For a communication to be libelous, it must constitute a serious threat to the plaintiff's reputation." *Davis v. Covenant Presbyterian Church of Nashville*, No. M2014-02400-COA-R9-CV, 2015 WL 5766685, at *3 (Tenn. Ct. App. Sept. 30, 2015) (perm. app. denied). Libel does not arise "simply because the subject of a publication finds the publication annoying, offensive or embarrassing. *The words must reasonably be construable as holding the plaintiff up to public hatred, contempt or ridicule*. They must carry with them an element of disgrace." *Id.* (citations omitted). " '[W]hether a communication is capable of conveying a defamatory meaning is a question of law for the court to decide in the first instance; it is then for the jury to decide whether the communication was in fact so understood by those who received it.'" *Id.* (quoting *Brown v. Mapco Express, Inc.*, 393 S.W.3d 696, 708 (Tenn. Ct. App. 2012)). We "look to the words themselves and are not bound by the plaintiff's interpretation of them." *Stones River Motors, Inc. v. Mid-South. Publ'g. Co., Inc.*, 651 S.W.2d 713, 719 (Tenn. Ct. App. 1983).

*Tidwell v. Holston Methodist Fed. Credit Union*, No. E201901111COAR3CV, 2020 WL 3481537, at *4 (Tenn. Ct. App. June 25, 2020) (emphasis added).

If the plaintiff in a defamation case is a public official or public figure, he or she must also prove that the libelous statement was made with "'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Hibdon v. Grabowski*, 195 S.W.3d 48, 58 (Tenn. Ct. App. 2005) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964)). Notably, this requirement is not so much an element of defamation under state law, but rather a matter of First Amendment protection—a constitutional limitation on state defamation causes of action imposed by the Supreme Court in *New York Times v. Sullivan. See* 376 U.S. at 279-80. (describing the requirement of actual malice as a "federal rule" that is a "constitutional guarantee[]"); *Thomas M. Cooley Law Sch. v. Kurzon Strauss, LLP* ["*Cooley*"], 759 F.3d 522, 527

8

(6th Cir. 2014) ("The actual malice standard arose from the Supreme Court's recognition that the First Amendment limits the extent to which speech may be chilled by tort liability.").[4] That is to say, the applicability and substance of "actual malice" requirement is a matter of federal (constitutional law). Accordingly, though discussing the actual malice standard in connection with the elements of defamation under Tennessee law, the Court will cite primarily federal cases, as well as some state cases that are in turn stating or applying (correctly, in the Court's view), principles relating to the applicability of the (federal) requirement of actual malice.

### 1. Does the Actual Malice Requirement Apply?

The Court first addresses whether the actual malice requirement is even applicable. As indicated above, that question turns on whether Plaintiff is a public figure. "There are two kinds of 'public figure' plaintiffs: a 'limited-purpose' public figure and a 'general-purpose' public figure." *Cooley*, 759 F.3d at 527. "A limited-purpose public figure is a public figure with respect to 'a limited range of issues,' and one achieves that status by 'voluntarily inject[ing] himself . . . into a particular public controversy.' A general-purpose public figure is one who attains 'such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts.'" *Id.* (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974)).

Defendants contend that Plaintiff is a limited-purpose public figure. As the Sixth Circuit explained in *Cooley*:

---

[4] On the other hand, the Court realizes that the "actual malice" requirement may additionally be considered at least *related* to a state-law element requiring some kind of fault on the part of the defendant. For example, in *Cooley*, the Sixth Circuit addressed a claim of defamation under Michigan law, the third element of which the court identified as "fault amounting at least to negligence on the part of the publisher." 759 F.3d at 527 The court then stated, "Regarding the third element—the fault standard—if the plaintiff is a 'public figure,' the plaintiff must also establish that the defendant published the defamatory statement 'with "actual malice,"—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Id.* at 527 (quoting *Herbert v. Lando*, 441 U.S. 153, 156 (1979)) (some internal quotation marks omitted). Thus, it is not inappropriate for analytical purposes, to discuss the requirement of actual malice as part and parcel of the analysis of the elements of defamation under state law, despite its actually being a creature of the First Amendment.

9

We have recognized that "*Gertz* establishes a two-pronged analysis to determine if a plaintiff is a [limited-purpose] public figure." *Clark v. ABC, Inc.*, 684 F.2d 1208, 1218 (6th Cir.1982) (citing *Gertz,* 418 U.S. at 345, 352, 94 S.Ct. 2997). "First, a 'public controversy' must exist." *Id.* "Second, the nature and extent of the individual's involvement in the controversy must be ascertained[,]" *id.,* so that the court can determine whether the plaintiff voluntarily injected itself into the particular public controversy giving rise to the alleged defamation, *Gertz,* 418 U.S. at 345, 351, 94 S. Ct. 2997.

In analyzing whether a "public controversy" exists, we are mindful that "all controversies of interest to the public" are not "public controversies" within the meaning of *Gertz. See Clark,* 684 F.2d at 1218. Rather, a "public controversy" is "a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way." *Waldbaum v. Fairchild Pub., Inc.,* 627 F.2d 1287, 1296 (D.C.Cir.1980). It is "a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants." *Id.; accord Lundell Mfg. Co., Inc. v. ABC, Inc.,* 98 F.3d 351, 363 (8th Cir.1996); *Partington v. Bugliosi,* 56 F.3d 1147, 1159 n. 18 (9th Cir.1995); *Foretich v. Capital Cities/ABC, Inc.,* 37 F.3d 1541, 1554 (4th Cir.1994). Most importantly, "the court must isolate the specific public controversy related to the defamatory remarks." *World Wide Ass'n of Specialty Programs v. Pure, Inc.,* 450 F.3d 1132, 1137 (10th Cir.2006).

In the second stage, we determine the nature and extent of a plaintiff's participation in a public controversy by considering three factors: "first, the extent to which participation in the controversy is voluntary; second, the extent to which there is access to channels of effective communication in order to counteract false statements; and third, the prominence of the role played in the public controversy." *Clark,* 684 F.2d at 1218 (citing *Gertz,* 418 U.S. at 344–45, 94 S. Ct. 2997, and *Wolston v. Reader's Digest Assoc., Inc.,* 443 U.S. 157, 165–68, 99 S. Ct. 2701, 61 L.Ed.2d 450 (1979)).

*Id.* at 529–30. Using this two-pronged analysis, the Court must first determine whether a public controversy exists.

Although it provided no express definition of "public controversy" in *Gertz,* the Supreme Court set helpful boundaries in *Time, Inc. v. Firestone,* 424 U.S. 448 (1976). There the plaintiff was a socially prominent woman in Palm Beach, Florida. *Id.* at 450. Time Magazine published a false report about the woman's divorce proceedings. *Id.* at 452. The United States Supreme Court held the actual malice standard inapplicable to this report because the divorce proceedings were

not considered public controversies even though they may have been interesting to portions of the public at large. *Id.* at 455. The Court rejected the idea that her divorce was necessarily a "public controversy" in the constitutional sense merely because it garnered media publicity and the plaintiff was a "cause celebre." *Id.* at 454. "Dissolution of a marriage through judicial proceedings is not the sort of 'public controversy' referred to in *Gertz*, even though the marital difficulties of extremely wealthy individuals may be of interest to some portion of the reading public." *Id.*

On a somewhat different note, in determining whether a public controversy exists, "courts look to see what matters were already in dispute prior to the time when the alleged defamatory statements were made." *Hibdon*, 195 S.W.3d at 60. "In determining whether there is a public controversy, it is vital to ascertain whether the dispute existed as a public concern prior to the alleged defamatory comments." *Id*. Defendants in defamation actions cannot, "by their own conduct, create their own defense by making the claimant a public figure." *Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979). "If the issue was being debated publicly and if it had foreseeable and substantial ramifications for nonparticipants, it was a public controversy." *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1297 (D.C. Cir. 1980).

The Court finds that *Hibdon*, though a state-court opinion, is instructive on the question of what constitutes a public controversy where the putative public figure is not a governmental official. There the plaintiff posted to an online jet ski enthusiast forum with worldwide users about his record-setting speeds on his modified jet skis. *Hibdon*, 195 S.W.3d at 53. He then appeared in a nationally circulated jet ski magazine, which confirmed his record-setting speeds. *Id.* at 53-54. The plaintiff brought suit after members of the forum posted allegedly defamatory messages about the plaintiff and his jet-ski speeds. *Id*. at 54-55. The Tennessee Court of Appeals found there that there was a public controversy surrounding the record-setting jet ski speeds and the jet ski

modifications the plaintiff used to achieve the purported speeds. *Id.* The court reasoned that the plaintiff knowingly and consciously sought publicity for his business with these postings. *Id.* "The controversy began following [the plaintiff's] posting on the news group of the success of his jet ski modifications, prior to the publishing of the defamatory statements made by the Defendants." *Id.* at 60. There were over 2,000 different postings on the jet-ski forum relating to the controversy. The court noted that because the jet ski forum had an international reach (by virtue of being on the internet), the magazine had a national circulation, and the record-setting claims being personally asserted by the plaintiff, there was a public controversy. *Id* at 60. The court further noted that the dispute's "ramifications would be felt by persons who are not direct participants, those persons being individuals in the jet ski modification business, as well as recreational jet ski enthusiasts and purchasers of jet skis." *Id.* Because of the postings by the plaintiff and the attention he received prior to the defamatory statements, and because the dispute[5] carried ramifications would be felt by persons who are not direct participants, he was found to be a limited-purpose public figure. *Id.*

In the present case, while this is a relatively close call, the Court finds that there is not a public controversy as outlined under *Cooley*. The dispute(s) surrounding whether the fund was connected to The Song and whether The Song should be released were those of private parties. The dispute was "public" only insofar as it had been the subject of a Facebook post and a retracted email to PlayMPE.com. Mr. Singletary passed away unexpectedly. Plaintiff sent an email blast to PlayMPE.com, a company who releases songs to radio stations, the next day hoping that they would play an unreleased song by Mr. Singletary; the proceeds of any online downloads would benefit a fund set up to help Holly Singletary. Mr. Singletary's business partner, Rhodes, posted

---

[5] The court characterized the dispute as one regarding "the accuracy of Hibdon's claimed successes with modifying jet skis to achieve record-breaking speeds[.]" *Hibdon*, 195 S.W.3d at 60.

on Facebook disputing the existence of the fund and to publicly air his grievances. That is essentially the extent of the public disclosure of the dispute prior to the alleged defamatory statements. Thus, even though the personas involved had some degree of public renown, it cannot be said that in this pre-publication period the dispute—advancing beyond a private dispute between individuals—rose to the level of public concern. Under these circumstances, the Court cannot find that the dispute satisfies the requirement, as articulated by *Hibdon*, of being a matter of public concern *before* the alleged defamatory statements were made.

Moreover, the dispute (whether considered before or after publication of the alleged defamatory statements) does not affect the general public in some *appreciable* way. The outcome of this dispute would not be felt by those outside of the dispute. The argument that radio DJs, music fans and, more centrally, Daryle Singletary fans would have been affected, does not hold much weight. While Plaintiff did seek attention for himself well before the allegedly defamatory statements were made, there was not a dispute affecting the public at the time the statements were made.

Based on the above, the Court finds that there was not a public controversy. And because there was no public controversy, Plaintiff cannot be said to be either a public figure or a limited-purpose public figure at the time the article was written. Therefore, the actual malice requirement set forth in *New York Times* is not applicable to this case.

Because the actual malice standard does not apply here, the Court looks exclusively to Tennessee state law to find the fault standard needed for defamation of private parties. "The *Gertz* decision permits each of the states to fashion a rule of liability based upon fault that is less than actual malice, so long as it does not impose liability without fault, to govern actions of libel by 'private' individuals against media defendants." *Memphis Publishing.*, 569 S.W.2d at 417. In

13

*Memphis Publishing*, the Tennessee Supreme Court adopted a negligence standard for defamation actions by private individuals against media defendants. *Id.*

> In determining the issue of liability, the conduct of the defendant is to be measured against what a reasonably prudent person would, or would not, have done under the same or similar circumstances . . . . In our opinion, the appropriate question to be determined from a preponderance of the evidence is whether the defendant exercised reasonable care and caution in checking on the truth or falsity and the defamatory character of the communication before publishing it.

*Pate v. Serv. Merch. Co.*, 959 S.W.2d 569, 574–75 (Tenn. Ct. App. 1996) (quoting *Memphis Publishing*, 569 S.W.2d at 418). Therefore, the Court will proceed with an analysis under a negligence standard.

### 2. Whether Any of the Individual Statements State a Claim for Defamation.

Although a showing of actual malice is not necessary in this case, the statements must be (negligently) false and also defamatory in nature for Plaintiff's defamation claim to survive Defendant's Motion to Dismiss. *See Bohler*, 429 F. Supp. 3d at 490. As described in more detail above, to be defamatory in nature, statements "must reasonably be construable as holding the plaintiff up to public hatred, contempt or ridicule." *Tidwell*, 2020 WL 3481537, at *4 (emphasis added).

Turning to the case at hand, the Court must analyze the specific statements which Plaintiff claims possess a defamatory meaning. Parsing the First Amended Complaint, it seems as though Plaintiff claims seven statements are defamatory:

(1) "Daryle Singletary's new single is a scam, not benefiting his widow and kids, business partner says" (the headline)

(2) "However, Singletary's business partner Chuck Rhodes told Fox News that not only does no such fund exist, but (3) the single released by Platinum Records Nashville is not a song of the late country singer."

14

(4) "However, Rhodes said the Singletary family has not been made aware of any fund for the family."

(5) "He [Rhodes] has sent a cease and desist letter to Platinum Records Nashville to remove the song immediately."

(6) "Rhodes, who has worked with Singletary for 21 years, told Fox News the song was 'never meant to be released'"

(7) "However, Platinum Records Nashville President Greg Hudik told Fox News the song was part of the final album he recorded with Singletary and was not a demo."

Notably, each of these statements of Defendants is a statement about what someone else (Rhodes or, as to the last statement, Plaintiff) allegedly said about a particular topic. So each statement can be viewed: (1) as making only the limited assertion that someone else (Rhodes or Plaintiff, as the case may be) made a particular comment; or (2) arguably as making the broader (and more consequential) assertion that what the commenter said was true.

With respect to the one alleged comment of Plaintiff, the Court will conduct its analysis from each vantage point because conceivably *either* Defendants' claim that Plaintiff made the comment,[6] *or* the substance of the alleged comment, could subject Plaintiff to public hatred, contempt or ridicule.

With respect to the six alleged comments of Rhodes, the Court need consider only the second vantage point. That is, Defendants' claim that Rhodes made the comment he allegedly made could not subject Plaintiff (as opposed to Rhodes)[7] to public hatred, contempt or ridicule.

---

[6] There is no question that persons can be subjected to public hatred, contempt or ridicule merely for allegedly having made a particular comment.

[7] If anyone were to be held up to public hatred, contempt, or ridicule based on Rhodes' mere alleged act of making a particular comment, it would be Rhodes, not Plaintiff.

However, the *substance* of each comment conceivably could subject Plaintiff (as opposed to Rhodes) to public hatred, contempt or ridicule.

**Statement 7**

The Court rejects out of hand the possibility that statement 7 support a defamation claim. This statement asserts that Plaintiff made a particular comment; this assertion is not defamatory, because Plaintiff would not be subjected to hatred, contempt, or ridicule merely for having commented that The Song was part of the final album he recorded with Singletary and was not a demo. Being known for saying something relatively innocuous like that simply does not invite the disgust or derision that would come with being known for saying, for example, that one race is superior to another. And as for the alleged facts conveyed by Plaintiff's alleged comment, they likewise do not have the required defamatory meaning; Plaintiff would not be held up to public hatred, contempt, or ridicule based on the alleged fact that The Song was part of the final album he recorded with Singletary and was not a demo; these alleged facts are innocuous. So this statement carries no defamatory meaning and thus cannot support a defamation claim.

**Statements 4-6**

The Court likewise rejects out of hand the possibility that statements 4, 5 and 6 support a defamation claim. Each of these statements conveys an alleged comment of Rhodes conveying underlying alleged facts which, even if proven false, would not have the required defamatory meaning necessary to hold the Plaintiff up to public hatred, contempt, or ridicule. Suppose that as of the time of publication, the Singletary family had not been made aware of any fund (statement 4), Rhodes had sent a cease and desist letter to Platinum Records Nashville (statement 5), or Rhodes could confirm (from working with Singletary for 21 years) that Singletary never intended

16

for The Song to be released (statement 6). Each of these circumstances may not be a good look for Plaintiff and conceivably could be seen by the public as generally inconsistent with Plaintiff's version of events, but they would hardly be the kind of thing that would foster disgust or derision about Plaintiff in the public mind. So these statements carry no defamatory meaning and thus cannot support a defamation claim.

**Statements 2 and 3**

The next few statements need to be analyzed more thoroughly to determine whether they can survive the Motion to Dismiss. First, the Court will analyze statements 2 and 3 together because they form one sentence with two objected-to parts. The statement "However, Singletary's business partner Chuck Rhodes told Fox News that not only does no such fund exist, but the single released by Platinum Records Nashville is not a song of the late country singer" is defamatory in multiple ways, according to Plaintiff. He claims that "Defendants' mischaracterization of Rhodes' comments implies that [Plaintiff] was not only misappropriating funds from a fake song that did not even involve Daryle Singletary, it also implies that [Plaintiff] had faked Singletary's vocals or was using a different singer and trying to pass the song off as one sung by Singletary." (Doc. No. 42 at ¶ 38). Notably, although Plaintiff claims that Defendants have falsely characterized Rhodes' comment, this allegedly false characterization itself cannot support Plaintiff's claim of defamation, as it does not convey any defamatory meaning as to *Plaintiff*; as indicated above, Defendants' assertion that Rhodes made particular comments (which, according to Plaintiff, Rhodes did not actually make as stated) by itself could not possibly hold Plaintiff (as opposed to Rhodes) up to hatred, ridicule or contempt.

But the possibility remains that the *substance* of Rhodes's alleged comments could carry a defamatory meaning. Plaintiff's focus is mainly, though not exclusively, on the second half of

Rhodes' alleged comment (labeled above statement 3), *i.e.*, that The Song was not a song of Mr. Singletary's. The Court grants that this substance, taken in context and without further clarification, could be defamatory, as it could suggest that Plaintiff was *dishonestly* passing off The Song as Mr. Singletary's when in fact Mr. Singletary was not involved with it. But the Article goes on to quote both Rhodes and Plaintiff affirming that indeed it was Mr. Singletary's voice recording on The Song. (Doc. No. 42-2). Thus, statement 3 cannot be said to be defamatory, because it is subjected to prompt clarification that The Song is indeed a song sung by Mr. Singletary. Sufficient clarification is thus provided for a reasonable reader to conclude that The Song *was* Mr. Singletary's (in at least the limited but significant sense that he sang it) and that Rhodes's alleged comment concerned only whether Mr. Singletary desired The Song to ever be released under his name.[8] With this clarification, the seemingly possible defamatory meaning (that Plaintiff was dishonestly passing off The Song as one as to which Mr. Singletary was involved) is no longer reasonable at all. The meaning left, instead, *at worst* is the relatively innocuous meaning that Plaintiff is seeking to release a song that Mr. Singletary sang but did not wish released under his name; again, this may not be a good look for Plaintiff and may reflect somewhat negatively on him, but that does not mean that it subjects him to hatred, contempt or ridicule. The Court finds that the defamatory meaning Plaintiff ascribes to statement 3 simply does not exist, given the later clarification that put it in context. Accordingly, statement 3 will not give rise to a defamation claim.

The substance of statement 2, however, presents an entirely different question. The substance conveyed by statement 2 is that no fund had been set up. This statement on its face could not support a defamation claim, because Plaintiff does not allege that it was false as required for a

---

[8] Two lines after the objected-to line, the article states, "Rhodes said the recording was simply 'work for hire where Daryle was a paid demo singer'" and later "Rhodes … told Fox News the song was 'never meant to be released.'"

claim of defamation under Tennessee law; Plaintiff does not claim that at the time of The Article was published a fund was set up, and in fact he appears to concede the opposite. But the question here is whether The Article needed to say more to clarify the statement in order to avoid conveying a false message with a defamatory meaning. Plaintiff claims that the substance of statement 2 implies, falsely and defamatorily, that he was involved in a scam or fraudulent scheme, namely, the solicitation of donations to an alleged (but non-existent) fund to benefit a grieving family with the intent to skim off the funds instead. Plaintiff apparently asserts that this implication arises from statement 2 in part because The Article omits Plaintiff's comments to Defendants that a fund would be set up pending approval from the Singletary family.

The Court will assume *arguendo* that the substance of statement 2, that no such fund exists, considered by itself in isolation, may convey a false and defamatory meaning,[9] *i.e.*, that Plaintiff never intended to set up a fund at all and instead was going to line his own pockets with donations intended by donors to go a fund for the Singletary family. While this could be a reasonable interpretation in isolation, "[a] court should be always mindful of the caveat that the words of the publication should not be considered in isolation, but rather within the context of the entire publication" *West v. Media Gen. Operations, Inc.*, 120 F. App'x 601, 617 (6th Cir. 2005) (internal brackets excluded). And the Court is mindful that the word "scam" appears in the headline of The Article. Crucially, however, The Article goes on to say that "Hudik said he is waiting until after

---

[9] The substance of statement 2 is true inasmuch as it is undisputed no fund existed at the time the Facebook post was made or The Article was published. However, "[t]ruth is available as an absolute defense only when the defamatory meaning conveyed by the words is true." *Memphis Publishing* 569 S.W.2d at 420. Thus, even though the substance of statement 2 is true, if *a defamatory meaning conveyed by statement* is untrue, then the statement could be actionable. So the next question here is whether the statement conveys a defamatory meaning.

19

Singletary's funeral to set up the fund but told Fox News he will remove the song if 'that's what Holly [Singletary] wants.'"

Significantly, nowhere does The Article claim that Hudik had falsely represented that donors that the fund had *already* been set up. To the contrary, it states that Platinum Records Nashville had announced that it "was setting up a fund," thus implying that Platinum Records Nashville had claimed only that the fund was *in the process* of being created. Thus, statement 2 is not defamatory under the theory that, in context, it implies that Plaintiff (through Platinum Records Nashville) had falsely claimed (in order to skim donations) that a non-existent fund was in fact already in existence.

Thus, as with statement 3, the substance of statement 2 is clarified later in The Article in a manner that precludes any defamatory meaning. Even assuming that such substance in isolation conveys falsely and defamatorily that Plaintiff never intended to set up the donation-attracting fund he claimed he would set up, any such meaning is refuted later in The Article by the clarification that the fund was not in existence *yet*, by Plaintiff's design. He was waiting until after the funeral to set it up, he told that to Defendants, and he was quoted in The Article saying as much. Because the quote from the Plaintiff later in The Article dispels any defamatory meaning that potentially could be attributed to statement number 2 despite its literal truth, this statement cannot give rise to a defamatory meaning and thus will not support a defamation claim.

Finally, according to Plaintiff, Rhodes never spoke with Defendants, who instead merely viewed Rhodes' Facebook post. If Plaintiff is correct about this, the line in statement 2 "Chuck Rhodes told Fox News" may not be truthful but would not carry any defamatory meaning as to Plaintiff; there is nothing about Defendants (allegedly) speaking to Rhodes that would hold Plaintiff up to hatred, contempt our ridicule. Thus, these words cannot support a defamation claim.

**Statement 1**

The statement at which Plaintiff (understandably) seems to take the most umbrage is the headline: "Daryle Singletary's new single is a scam, not benefiting his widow and kids, business partner says." The question this Court must answer is whether the statement that Rhodes called the new single a "scam"—a word that (according to the First Amended Complaint) Rhodes never used—can be said to (1) be untruthful; and (2) convey a defamatory meaning. The issue is whether the *substance* of Rhodes' alleged statement—that The Song is a scam—could have a defamatory meaning and, if so, whether the claim that Rhodes made such a statement could be deemed to have been made with at least negligent falsity.[10] *See Brown v. Mapco Exp., Inc*., 393 S.W.3d 696, 708 (Tenn. Ct. App. 2012) ("For the defendant to be liable for defamation, 'there must be publication of matter that is both defamatory and false.'") (citation omitted); *see also Memphis Publishing Co.*, 579 S.W.2d at 417 ("the appropriate question to be determined from a preponderance of the evidence is whether the defendant exercised reasonable care and caution in checking on the truth or falsity and the defamatory character of the communication before publishing it."); *Bohler*, 429 F. Supp. 3d at 490 (explaining that to prove a prima facie case of defamation under Tennessee law the plaintiff must show that the statement was made "with knowledge that the statement was false and defaming to the other; or [] with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement."). In other words, the question here is whether Plaintiff has adequately alleged both the untruthfulness of the claim that Rhodes called

---

[10] The Court is careful here, again, to distinguish between (a) a defamatory meaning as to Defendants' published claim that Rhodes said something in particular, *i.e.*, made a particular comments; and (b) a defamatory meaning as to the *substance of what Rhodes reportedly said* being defamatory to Plaintiff. The Court notes, consistent with what it has said above, that The Article's claim that Rhodes took the action of making some particular comment cannot be defamatory as to Plaintiff; if anyone could possibly be held up to public hatred, contempt or ridicule merely for Rhodes' taking such an action, it would be Rhodes and not Plaintiff.

the new single a scam, negligence or recklessness in failing to ascertain the truth of such statement, and the defamatory meaning (with respect to Plaintiff) of such claim.

The First Amended Complaint alleges that Rhodes never said that Plaintiff was committing a scam and told Plaintiff, "Not once did I imply or use the word scam. That word came from Fox News." (Doc. No. 42 at ¶ 49). And the Facebook post manifestly does not say that The Song was a "scam," that Plaintiff was committing a "scam," or use the word "scam" at all. And to the extent that Defendant would claim that Rhodes essentially said that the new single was a scam, assuming that such "essential" truth could be a defense, the Court cannot find as a matter of law that Rhodes said essentially (even if not exactly) that this was a scam. According to the allegations of the First Amended Complaint, Rhodes's Facebook post was the only information available to Defendants to support their published headline that Rhodes called the new single a "scam." And the Facebook post is by no means clear that Rhodes was alleging anything that reasonably could be called a "scam." Under extant dictionary definitions, a scam is something very unsavory (and perhaps also illegal) indeed; it has been defined, for example, as "a fraudulent or deceptive act or operation"[11] or "an illegal trick, usually with the purpose of getting money from people or avoiding paying tax."[12] But the Facebook post is easily interpretable as complaining about something far less nefarious than fraud, deception, or illegal activity; indeed, on balance it seems to suggest that the problem is (1) that the release of the song is *unauthorized* or otherwise generally *inappropriate;* and (2) that pronouncements regarding a fund are *premature*, *unauthorized*, and *presumptuous*. Again, these suggestions hardly reflect well on Plaintiff. But they clearly stop short of insinuating fraud or illegal activity in the form of, for example, tricking people into making perceived

---

[11] https://www.merriam-webster.com/dictionary/scam (last accessed January 5, 2021).

[12] https://www.collinsdictionary.com/dictionary/english/scam (last accessed January 5, 2021).

22

"donations" to the Singletary family that Plaintiff then would skim off. Thus, Defendants' paraphrasing of Rhodes' Facebook post as alleging a "scam" is not, as a matter of law, essentially truthful; instead, a jury could find the headlines claim that Rhodes alleged a scam to be simply false. And a jury likewise could certainly find that such falsity was negligent inasmuch as the jury could find that the falsity reflected Defendants' careless (and incorrect) paraphrasing of something Rhodes said.

That is not the end of the inquiry, though, as the Court must determine whether this statement could convey a defamatory meaning. The Court finds that the headline and its use of the word "scam" could be found by a jury to convey a defamatory meaning as to Plaintiff.[13] Given the connotations of the word "scam" as defined above, Plaintiff indeed could be held up to public hatred, contempt, or ridicule for perpetrating a "scam," especially one that involves the misuse of a recording of a recently deceased person and collecting donations purportedly on behalf of a grieving family. It is true that The Article conveys statements from Rhodes that individually might suggest the possibility that Rhodes believed something less nefarious (though still objectionable) was going on. But when the headline—which of course serves as a summary of the article—refers to Rhodes calling this a "scam," a reader obviously would tend to conclude that (at least in Rhodes's purported view) what is going on is a scam. Thus, the content of the Article does not negate any defamatory meaning that could be drawn from the headline. Simply put, the Court cannot conclude as a matter of law at the motion-to-dismiss stage that this headline does not hold Plaintiff up to hatred, contempt, or ridicule.

_____

[13] The headline speaks only of Rhodes claiming that *The Song* is a scam, without expressly saying that *Plaintiff is perpetrating* a scam via The Song. But in context, the headline is quite obviously conveying that Rhodes is claiming that Plaintiff is doing that.

As Plaintiff plausibly has alleged the elements of a defamation claim with respect to the headline referring to Rhodes' alleged claim of a scam, Defendants' Motion to Dismiss will be denied in this respect.

## II.    False Light Claim

Plaintiff asserts a claim of false light invasion of privacy. Tennessee has adopted Section 652E of the Restatement (Second) of Torts' definition of false light, which dictates that a plaintiff must allege: "(a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *West*, 53 S.W.3d at 644 (quoting Restatement (Second) of Torts § 652E (1977)). Section (b) is analogous to the actual malice standard discussed above from *New York Times*. *Id.* at 647; *see also Eisenstein v. WTVF-TV, News Channel 5 Network, LLC*, 389 S.W.3d 313, 317 (Tenn. Ct. App. 2012) ("if the plaintiff is a public official or public figure, the appropriate standard for false light claims is actual malice"). However, Tennessee courts have differed with the Second Restatement to the extent that the Restatement requires actual malice standard for all false light claims; Tennessee has lowered the standard to negligence for false light claims brought by private plaintiffs about matters of private concern. *West*, 53 S.W.3d at 648 ("[W]hen false light invasion of privacy claims are asserted by a private plaintiff regarding a matter of private concern, the plaintiff need only prove that the defendant publisher was negligent in placing the plaintiff in a false light."); *see also Lewis v. NewsChannel 5 Network, L.P.*, 238 S.W.3d 270, 303 (Tenn. Ct. App. 2007). For false light claims, the actual malice standard applies only when the plaintiff is a public figure or the matter is one of public concern, but the negligence standard applies when the plaintiff is a private person dealing with matters of private concern. *See Lewis*, 238 S.W.3d at 303; *Shamblin v. Martinez*, No.

M2010-00974-COA-R3CV, 2011 WL 1420896, at *3 (Tenn. Ct. App. Apr. 13, 2011). Here, the Court has already found that Plaintiff is not a public figure, and the events at issue were not matters of public concern; thus, the actual malice standard does not apply.

Literal truth is not a full defense to a false light claim. *Eisenstein*, 389 S.W.3d 313. "The facts may be true in a false light claim. However, the angle from which the facts are presented, or the omission of certain material facts, results in placing the plaintiff in a false light." *Id.* at 317 (citing *West*, 53 S.W.3d at 647). The main inquiry is whether the defendant published information in a way which the publication could be "susceptible to inferences casting the plaintiff in a false light." *Id.* (internal brackets and quotations omitted).

The headline "Daryle Singletary's new single is a scam, not benefiting his widow and kids, business partner says" may support a false light claim. As the Court noted above, a scam is something very unsavory (and perhaps also illegal). Thus, being accused of perpetuating a "scam" may be highly offensive to a reasonable person. As also described above, the First Amended Complaint alleges that Rhodes did not use the word "scam" in his Facebook post and that he told Plaintiff, "Not once did I imply or use the word scam. That word came from Fox News." (Doc. No. 42 at ¶ 49). As noted above, Rhodes's Facebook post is easily interpretable as complaining about something far less nefarious than fraud, deception, or illegal activity. Thus, based on these allegations, Plaintiff has alleged that Defendants had knowledge of or acted in reckless disregard of the false light in which Plaintiff would be placed. Accordingly, Plaintiff's false light claim survives Defendants' Motion to Dismiss.

## III.    Defamation by Implication

Plaintiff further alleges a claim of defamation by implication. Defamation by implication occurs when statements that are true are nevertheless actionable because they imply facts that are

not true. *Aegis Scis. Corp. v. Zelenik*, No. M2012–00898–COA–R3–CV, 2013 WL 175807, at *11

(Tenn. Ct. App. Jan. 16, 2013). The Tennessee Court of Appeals recently explained:

> [t]o prevail on [a] defamation by implication or innuendo claim, [the plaintiff] must
> establish [] that [the defendant] published the statements and that the meaning
> reasonably conveyed by the statements was defamatory. *Nichols*, 569 S.W.2d at
> 420 . . . . [I]f the statements at issue are true but they imply facts that are not true, a
> defendant who made the statements may be liable for defamation by implication or
> innuendo. *Grant [v. Commercial Appeal*, No. W2015–00208–COA–R3–CV, 2015
> WL 5772524, at *12 (Tenn. Ct. App. Sept. 18, 2015]).

*Loftis v. Rayburn*, No. M2017-01502-COA-R3-CV, 2018 WL 1895842, at *5 (Tenn. Ct. App. Feb.

5, 2018). The Sixth Circuit has explained that under Tennessee law, "[t]he question of whether [a

writing] was understood by its readers as defamatory is a question for the jury, but the preliminary

determination of whether the [writing] is 'capable of being so understood is a question of law to

be determined by the court.'" *Seaton v. TripAdvisor LLC*, 728 F.3d 592, 597 (6th Cir. 2013)

(quoting *McWhorter v. Barre*, 132 S.W.3d 354, 364 (Tenn. Ct. App. 2003)).

In *Memphis Publishing*, the plaintiff sued the defendant, a newspaper, when the newspaper

ran a story about a wife who shot her husband and another woman (the plaintiff) after the wife

found her husband at the other woman's house. 569 S.W.2d at 414. The plaintiff brought a

defamation claim against the defendant, asserting that the defendant falsely implied that she was

having an affair and that the wife caught them together when (presumably upset about the

perceived affair) she fired the shots. *Id.* The undisputed evidence showed, however, that several

people were at the plaintiff's house when the assailant found her husband, and they were all sitting

around the living room talking. *Id.* Nevertheless, the court reasoned that the truth of the statements

did not relieve the newspaper of liability if "the meaning reasonably conveyed by the published

words is defamatory." *Id.* at 420. The Court explained that "[t]he published statement . . . so

distorted the truth as to make the entire article false and defamatory." *Id.*

Here, the statements to which Plaintiff objects based on the omission of related facts,[14] *i.e.,* the statements that The Song was not one of Mr. Singletary's or that the fund had not been set up, were clarified later in The Article. Such clarifications removed any falsity that potentially could have resulted from the omissions about which Plaintiff complains.[15] Plaintiff is not alleging that Defendants made any other statements that are literally true but give rise to a defamatory meaning. This theory of recovery is thus not applicable to this case and will be dismissed.

## CONCLUSION

For the reasons discussed herein, Defendants' Motion to Dismiss (Doc. No. 47) will be **GRANTED in part and DENIED in part.** Plaintiff's defamation by implication claim will be dismissed. Plaintiff's defamation claim (as to the statement in the headline) and false light claim survive.

An appropriate order will be entered.

*Eli Richardson*

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

[14] Namely, statements 2 and 3 as noted above.

[15] The clarifications likewise served to remove any defamatory meaning derivable from statements 2 and 3, as discussed above.